IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

STEPHEN C. LYNCH              )
                             )
v.                           )    No. 1:05-0086
                             )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


### REPORT AND RECOMMENDATION

          This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB") and supplemental security income
("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 15), to which defendant has responded
(Docket Entry No. 18).  Plaintiff has further filed a reply brief
in support of his position (Docket Entry No. 19).  Upon
consideration of these papers and the transcript of the
administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be **GRANTED IN PART**
and **DENIED IN PART**, and that the case be **REMANDED** for
administrative consideration of new and material evidence

Case 1:05-cv-00086   Document 21   Filed 08/28/07   Page 1 of 23 PageID #: 92

pertaining to plaintiff's Ménière's disease,[1] pursuant to the sixth sentence of § 405(g).

## I. INTRODUCTION

Plaintiff filed his DIB and SSI applications on November 6, 2002, alleging that he had been disabled since October 15, 2001, due to nerve damage from a ruptured disc in his neck causing sharp neck pain, nervous spasms, and severe headaches (Tr. 18, 64-66, 75). At the state agency level of review, plaintiff's applications were denied both initially and upon reconsideration (Tr. 33-40, 43-46). Thereafter, upon plaintiff's request, a de novo hearing was held before an Administrative Law Judge ("ALJ") on June 14, 2004. Plaintiff appeared with counsel, and testimony was received from both plaintiff and an impartial vocational expert ("VE") (Tr. 271-303). On February 4, 2005, the ALJ issued a written decision wherein she found that plaintiff was not disabled (Tr. 15-29). The decision contained the following enumerated findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act

---

[1]Ménière's disease is a disorder of the membranous labyrinth of the inner ear that is marked by recurrent attacks of dizziness or vertigo, tinnitus, and hearing loss. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=meniere's%20disease; http://www.nlm.nih.gov/medlineplus/ency/article/000702.htm

It appears that dizziness may be distinguished, as a feeling of unsteadiness, from rotary vertigo, which is the perception of spinning. http://oto.wustl.edu/men/mn1.htm

2

and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since his alleged onset date, October 15, 2001.

3.   The claimant has severe impairments as defined in the Social Security Regulations.  (20 CFR §§ 404.1520, 416.920).

4.   The claimant's impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has a residual functional capacity for light work with limitations.

7.   The claimant is unable to perform any of his past relevant work.  (20 CFR §§ 404.1565, 416.965).

8.   The claimant is a younger individual.  (20 CFR §§ 404.1563, 416.963).

9.   The claimant has a limited education.  (20 CFR §§ 404.1564, 416.964).

10.  The claimant has no transferable skills from semiskilled and skilled past work.  (20 CFR §§ 404.1568, 416.968).

11.  The claimant has the residual functional capacity to perform a significant range of light work.  (20 CFR §§ 404.1567, 416.967).

12.  Although the claimant's exertional limitations to not allow him to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include the following:  cashier; security guard; assembler; and inspector.

13.  The claimant was not under a "disability," as defined

3

in the Social Security Act, at any time through the
date of this decision.  (20 CFR §§ 404.1520, 416.920).

(Tr. 28)

On June 25, 2005, the Appeals Council denied
plaintiff's request for review of the decision of the ALJ (Tr. 7-
9), thereby rendering that decision the final decision of the
Commissioner.  This civil action was thereafter timely filed, and
the Court has jurisdiction.  42 U.S.C. § 405(g).  If the
Commissioner's findings are supported by substantial evidence,
based on the record as a whole, then these findings are
conclusive.  <u>Id.</u>


## II.  REVIEW OF THE RECORD

### A.  <u>Medical Evidence</u>[2]

The medical file contains treatment records from Dr.
Charles Stimpson, M.D., who treated plaintiff from May 11, 2001
to November 21, 2001 (Tr. 122-130).  On May 11, 2001, plaintiff
went to Dr. Stimpson for a routine medical exam and a hearing
test was conducted.  It showed that his hearing in his left ear
was abnormal (Tr. 125).  On May 11, 2001, Dr. Stimpson's office
diagnosed hearing loss left chronic (Tr. 125).  On June 19, 2001,
plaintiff called his doctor's office complaining that his blood

---

[2]This recitation of the medical evidence is taken from plaintiff's brief
(Docket Entry No. 15 at 4-8).  Defendant did not endeavor to summarize the
facts, and does not contest plaintiff's summary.

4

pressure was low, his blood sugar 100, and he feels dizzy (Tr. 125). On October 16, 2001, plaintiff saw Dr. Stimpson and complained that his neck and left shoulder had bothered him for the past two weeks (Tr. 123). Dr. Stimpson scheduled an MRI because of ongoing pain (Tr. 126). However, it appears that plaintiff saw an orthopedic doctor before an MRI was conducted.

The medical record contains treatment records from Dr. William H. Ledbetter, M.D., an orthopedic surgeon, dated from October 23, 2001 to April 15, 2002 (Tr. 169-187). On October 23, 2001, plaintiff saw Dr. Ledbetter for the first time (Tr. 182). He reported that his left eye was twitching and complained that he had been dizzy for a few days but that problem had cleared up (Tr. 182). He found minor motion restrictions, but otherwise his exam was normal except for the complaints of pain (Tr. 182). He recommended physical therapy and prescribed some Flexeril and Motrin 800 mg (Tr. 181). On October 31, 2001, Dr. Ledbetter saw plaintiff again, and plaintiff complained of ongoing neck and left shoulder pain (Tr. 180). Dr. Ledbetter took some x-rays of the cervical spine and found minor narrowing and spurs consistent with degenerative disc disease (Tr. 180). Dr. Ledbetter stated that if there were no improvement in one week he would see about an MRI scan and EMG of the left upper extremity (Tr. 180). Plaintiff saw Dr. Ledbetter again on November 6, 2001, and he told him that his neck had improved but that his left shoulder

5

was still in pain (Tr. 179).  Dr. Ledbetter recommended trigger
point injections, ordered an MRI scan, and prescribed Vioxx for
the pain (Tr. 179).  The MRI scan of the cervical spine was
performed on November 8, 2001, and the MRI showed that plaintiff
suffered from mild bilateral neuroforaminal narrowing at C5-6 and
mild neuroforaminal narrowing at C4-5 on the right by posterior
osteophyte (Tr. 183).  On the same day, an EMG study was
performed, and it came back normal (Tr. 184-185).  After the MRI
and EMG were performed, Dr. Ledbetter referred plaintiff to
orthopedic surgeon Dr. Warren McPherson, M.D., for further
treatment (Tr. 177).  Plaintiff did see Dr. Ledbetter a few times
after Dr. McPherson had begun treatment, but he basically
concluded that Dr. McPherson's treatment had been successful (Tr.
170-176).

The medical record contains treatment records from Dr.
McPherson dated from November 19, 2001 to April 22, 2002 (Tr.
194-220).  Dr. McPherson treated plaintiff after the conservative
treatment with Dr. Ledbetter failed.  Plaintiff first saw Dr.
McPherson on November 19, 2001 (Tr. 208).  He reviewed the MRI
taken November 8, 2001 and found that plaintiff had generalized
bulging especially to the left (Tr. 208). He prescribed Tylenol 3
and had him come back in a week (Tr. 208).  Dr. McPherson stated
that conservative treatment had been attempted but it did not
work (Tr. 206-207).  On December 11, 2001, when plaintiff saw Dr.

6

McPherson again, he was still in pain (Tr. 205).  They decided
that Dr. McPherson would perform an anterior cervical discectomy
at C5-C6 (Tr. 205).  The surgery was performed on December 14,
2001 (Tr. 202-204).  After the surgery he was seen again by Dr.
McPherson on January 14, 2002.  He prescribed Flexeril and
ordered some physical therapy (Tr. 201).  Dr. McPherson next saw
plaintiff on January 29, 2002, and he still had some neck pain
(Tr. 200).  Dr. McPherson allowed plaintiff to go back to light
duty, and then regular work in three weeks (Tr. 200).  On March
14, 2002, Dr. McPherson again saw plaintiff and he complained of
pain over his acromioclavicular joint.  Dr. McPherson had a hard
time making sense of plaintiff's pain.  He sent plaintiff for
another MRI and EMG (Tr. 199).  The EMG was performed on March
20, 2002, at Murfreesboro Medical Clinic (Tr. 161-168).  The
finding on EMG was minimal according to Dr. John Witt, M.D. (Tr.
162).  No active radiculopathy could be found (Tr. 162).  On
March 21, 2002, plaintiff had another MRI performed at the Bone
and Joint Clinic (Tr. 214-215).  On March 22, 2002, Dr. McPherson
reviewed the MRI and found no evidence of nerve root entrapment,
but he did find some subluxation at C5 posterior to C6 (Tr. 198).
He did not know if that was significant or not, and he was going
to get some flexion and extension views of the neck (Tr. 198).
He saw Dr. McPherson for the last time April 22, 2002 (Tr. 196).
Dr. McPherson stated that plaintiff complained of neck pain but

7

that all functions appear to be normal (Tr. 196). He diagnosed plaintiff with a cervical neck strain (Tr. 195). After April 22, 2002, plaintiff did not see Dr. McPherson again according to the medical record.

On July 8, 2002, plaintiff saw Dr. Lloyd Walwyn, M.D., an orthopedic surgeon, at the request of his Workers' Compensation lawyer for the purposes of filling out a C-32 form[3] to be used in his Workers' Compensation case (Tr. 227). In the physical examination by Dr. Walwyn, plaintiff described his problems as pain in neck, headaches, twitching eyes, throbbing in left shoulder and arm, left hand weak and numb, left leg numbness (Tr. 227). He states that his headaches get so bad that it was hard for him to function (Tr. 228). Dr. Walwyn went on to fill out a Functional Capacity Assessment which stated that plaintiff could lift a maximum of 30 pounds, frequently lift and carry 15 pounds, stand and/or walk a total of less than about 6 hours, with moderate limitation in the ability to push and/or pull (Tr. 229). Dr. Walwyn also stated in his Functional Capacity Assessment that plaintiff could occasionally do climbing, balancing, stooping, kneeling, and twisting, could never do crouching and crawling, and should avoid heights and moving machinery (Tr. 230).

---

[3]A C-32 form is a form used in Workers' Compensations cases in Tennessee. These forms can be admitted into evidence instead of a deposition of a doctor.

8

Dr. Andrew Miller, M.D. filled out a physical residual functional capacity assessment of plaintiff on December 12, 2002, for the Disability Determination Section (Tr. 232-239). Dr. Miller states that plaintiff can occasionally lift 20 pounds, and frequently lift up to 10 pounds (Tr. 233). He can stand and/or walk about 6 hours in an 8-hour work day, and he can sit with normal breaks about 6 hours in an 8-hour work day (Tr. 233). He has unlimited pushing and pulling capability (Tr. 233). He can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds (Tr. 234). He assessed plaintiff as limited in reaching all directions, handling, fingering, and feeling with his left hand, but unlimited with his right hand (Tr. 235). Plaintiff is also to avoid hazards (e.g., rapid moving machinery and heights).

Plaintiff first saw Dr. Wilburn on April 30, 2004. Plaintiff complained of headaches, dizziness, double vision, blurred vision, hearing loss, anxiety, depression, difficulty sleeping, morning stiffness, muscle tenderness, and muscle weakness (Tr. 251). Dr. Wilburn noted that plaintiff had several complaints, more than you would expect with his injury (Tr. 250). Dr. Wilburn also noted plaintiff's history of headaches, dizziness, double vision, blurred vision and hearing loss (Tr. 249). Dr. Wilburn ordered an MRI and an EMG nerve conduction study (Tr. 250). The MRI showed that plaintiff had a mild

9

concentric disc bulge at C4-5; at C5-6, the image was remarkable for degenerative disc height loss, broad diffuse disc bulge and small posterior end plate osteophytes as well as degenerative changes at the uncovertebral joints, with resultant moderate bilateral foraminal stenosis as well as mild central spinal canal stenosis, and with no cord impingement or edema evident; and at C6-7, a broad diffuse disc bulge was identified (Tr. 240). On May 24, 2004, Dr. Bryan Tuberville, M.D. did a nerve conduction study on plaintiff (Tr. 245). He concluded that plaintiff had an abnormal study in that there was electrodiagnostic evidence of acute vs. chronic C5-6 radiculopathy affecting the upper left extremity (Tr. 245). Dr. Tuberville states clinical correlation is required for the diagnosis (Tr. 245).

On June 2, 2004, Dr. Wilburn examined the MRI and concluded that plaintiff suffers from 1) status post C5-6 discectomy without a fusion, 2) chronic left C5-6 radiculopathy, 3) chronic myofascial pain from the neck and shoulder, and 4) chronic back and leg pain with an objectively normal examination and with a normal EMG nerve conduction study (Tr. 247). Dr. Wilburn filled out a Treating Source Statement on July 14, 2004. He stated that plaintiff could sit for 2 hours at one time, stand for 2 hours at one time, and that total for the 8-hour day he could stand for 4 hours and sit for 4 hours (Tr. 253). Next he found that plaintiff could do simple grasping with his right and

10

left hand and pushing and pulling with his right hand but not his left hand, and that he could do fine manipulation with his right and left hand (Tr. 253). Next he found plaintiff could occasionally lift and carry up to 19 pounds and rarely carry up to 49 pounds (Tr. 253-254). He can also squat frequently, bend occasionally, rarely reach above shoulder level with his left arm, and never climb or crawl (Tr. 254). Also, he should not be around unprotected heights, and has a moderate impairment being around moving machinery (Tr. 254). Finally, Dr. Wilburn states that plaintiff is in moderately severe pain (Tr. 254).

## B. <u>Testimonial Evidence</u>

Plaintiff was born on April 17, 1963, and was forty-one years old at the time of his ALJ hearing (Tr. 275). He testified that Dr. Wilburn was his current treating physician, and that his current prescription medications were Ultracet, Neurontin, Celebrex, and Zanaflex (Tr. 277-78). Plaintiff testified that he had a work-related accident on October 15, 2001, which resulted in a workers' compensation settlement paid in a lump sum (Tr. 278). He testified that he had surgery in December of 2001, but that the only benefit of the surgery was that he could move his head to the right, but not up, down, or to the left, whereas before the surgery his head position was "locked to the left side." (Tr. 279) After his post-surgical narcotic pain medicine ran out, plaintiff started taking as many as 18-20 Aleve tablets

11

per day, until he started seeing Dr. Wilburn in 2004 (Tr. 282).

Plaintiff testified that his pain was constant (Tr. 283). In particular, he testified that his headaches are "almost unbearable." (Id.) He testified that he could sit and stand for about thirty minutes at a time, could walk for 5-10 minutes, could lift 30-40 pounds with his right hand and 10-15 pounds with his left hand, and could not bend down (Tr. 284). Plaintiff testified that he had a valid driver's license but was not able to drive (Tr. 285). He stated that if he turns his head to the left, his eye will start to twitch. (Id.)

Plaintiff testified that he was almost totally housebound, and that after he gets up in the morning, eats breakfast, and takes a shower, his head is hurting so badly that he lies back down (Tr. 286). He stated that he lies down for a total of at least four hours per day, 30-45 minutes at a time. (Id.) He testified that his wife and three children take care of the household chores and yardwork (Tr. 289). He stated that climbing stairs is not easy because he gets lightheaded. (Id.)

Plaintiff testified that he had given up hunting and fishing, no longer attended church, and could not sit long enough to watch his girls play basketball (Tr. 290). He stated that his main problem is the pain up through his neck which affects his eyes, resulting in an inability to drive or otherwise function on a daily basis (Tr. 291).

III.  CONCLUSIONS OF LAW

A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human</u>

13

<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

      B. <u>Proceedings at the Administrative Level</u>

      The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national

---

    [4]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

15

## C. <u>Plaintiff's Statement of Errors</u>

Plaintiff does not claim entitlement to a judicial award of benefits, but seeks an order of remand for further administrative consideration of his disability applications. Plaintiff primarily argues for a sentence six remand, so that the Commissioner may reconsider his case in light of new evidence (Docket Entry No. 14, Exh. A & B) demonstrating his diagnosis with Ménière's disease and "failed cervical surgery syndrome with persistent left arm pain."[5]  In response to plaintiff's argument for a sentence six remand, the government argues that the new evidence which plaintiff relies upon is immaterial to the determination of his benefits claim, in that it does not pertain to the period prior to the Commissioner's final decision, and speaks to an inner ear condition when plaintiff had never before alleged any impairment related to his ears.  The government further argues that plaintiff has not shown good cause excusing his failure to adduce this evidence while his claim to benefits was still pending before the Social Security Administration ("SSA").

It is well established that the party seeking remand bears the burden of showing that remand is proper under § 405(g).

---

[5]Plaintiff further argues, in the alternative, that reversal and remand would be appropriate under the fourth sentence of § 405(g), in light of legal error in the ALJ's analysis.  Inasmuch as the undersigned finds merit in plaintiff's primary argument, analysis of his alternative arguments is not undertaken here.

16

<u>Sizemore v. Sec'y of Health & Human Svcs.</u>, 865 F.2d 709, 711 (6th

Cir. 1988).  The sixth sentence of § 405(g) states that the Court

"may at any time order additional evidence to be taken before the

Commissioner of Social Security, but only upon a showing that

there is new evidence which is material and that there is good

cause for the failure to incorporate such evidence into the

record in a prior proceeding[.]"  As noted by the Sixth Circuit

in <u>Foster v. Halter</u>, 279 F.3d 348 (6th Cir. 2001), for purposes

of a sentence six remand,

> [E]vidence is new only if it was "not in existence or
> available to the claimant at the time of the
> administrative proceeding."  Such evidence is
> "material" only if there is "a reasonable probability
> that the [Commissioner] would have reached a different
> disposition of the disability claim if presented with
> the new evidence."  A claimant shows "good cause" by
> demonstrating a reasonable justification for the
> failure to acquire and present the evidence for
> inclusion in the hearing before the ALJ.

<u>Id.</u> at 357 (internal citations omitted).

It is undisputed that the evidence plaintiff has come

forward with is new, as it was not in existence at the time of

the administrative proceeding.  However, defendant points out

that the mere fact that the evidence at issue was not in

existence at the time of the ALJ's decision does not establish

good cause for plaintiff's failure to obtain such medical

treatment and resulting evidence earlier.  <u>Citing</u> <u>Perkins v.

Apfel</u>, 14 Fex.Appx. 593, 2001 WL 845704, at *6 (6th Cir. July 17,

2001).  This "harder line" on the good cause requirement is well

17

established by Sixth Circuit precedent.  E.g., Oliver v. Sec'y of
Health & Human Servs., 804 F.2d 964, 966 (6th Cir. 1986)(citing
Willis v. Sec'y of Health & Human Servs., 727 F.2d 551, 554 (6th
Cir. 1984)).

　　　　In this case, plaintiff argues that "there is good
cause because the diagnoses [of Ménière's disease and failed
cervical surgery syndrome] did not exist at the time of the ALJ
hearing nor the Appeals Council decision..."  (Docket Entry No.
15 at 13)(emphasis supplied)  The undersigned views this argument
as an attempt to distinguish this case from one where the request
for remand involves more recent evidence of the effects of an
impairment that had already been established before the agency.
While defendant does not draw this distinction, it does argue
that plaintiff has not shown any reason for waiting until after
the ALJ denied his claim to seek other medical opinions.
Defendant further notes that while the new evidence reflects
plaintiff's apparent loss of insurance coverage after being
divorced by his wife in the spring of 2005 (Docket Entry No. 14,
Exh. B at 5), the medical benefits he was granted as part of his
workers' compensation settlement on July 24, 2004 (Tr. 113)
should have been available to him.  Plaintiff replies by pointing
out that the benefits he received as part of that settlement were
limited to "treatment relative to the plaintiff's neck" (Tr.
113), and that his treatment for Ménière's disease was thus not

18

covered during his transition from his ex-wife's insurance. As further explained below, the undersigned finds that plaintiff has met his burden of demonstrating good cause in relation to the evidence of his Ménière's disease.

However, the undersigned finds plaintiff's burden unmet with respect to the additional evidence of plaintiff's cervical spine impairment (Docket Entry No. 14, Exh. B). Though the diagnosis of "failed cervical surgery syndrome" had not been previously made, plaintiff has not offered any reasonable justification for his failure to pursue treatment, prior to the ALJ's February, 2005 decision, with the physician who gave this diagnosis. Rather, it appears that this evidence is simply a more recent response to the structural and chronic pain symptoms for which plaintiff had been treated during the period subject to agency review. (<u>E.g.</u>, Tr. 240, 247) Accordingly, remand for the consideration of the new evidence concerning plaintiff's cervical spine impairment is not justified.

However, as to the evidence of Ménière's disease from Dr. Mitchell K. Schwaber, a specialist in otology and neurology (Docket Entry No. 14, Exh. A), there appears to be good cause justifying plaintiff's failure to earlier procure this evidence. First, the evidence itself reveals that plaintiff presented on August 9, 2005, with "a very complicated case." (<u>Id.</u> at 7) Plaintiff has a remote history of left ear problems, having

19

undergone surgery for fistula[6] repair in 1990 (<u>id.</u>; Tr. 249) and
apparently suffering sensorineural hearing loss since that time
(<u>see</u> Tr. 125 [physician's record dated May, 2001 noting "hearing
impairment left (chronic)"]).  It appears that plaintiff only
sought a specialist's care with the onset or worsening of his
vertigo ("5 episodes in the last 5 months" prior to August,
2005), and with the contemporaneous development of <u>right</u>
progressive sensorineural hearing loss ("Now he is having right
progressive hearing loss.").  (Docket Entry No. 14, Exh. A at 7)
Moreover, regarding defendant's objection that plaintiff had
never before alleged any impairment relating to his ears (Docket
Entry No. 18 at 8), it appears that plaintiff and his physicians
reasonably believed his longstanding symptoms of severe
headaches, twitching of the eyes, and occasional dizziness to be
solely associated with his neck injury and subsequent disc
surgery in 2001 (Tr. 75, 96, 242, 291), and therefore perceived
no need to investigate the possibility of inner ear involvement;
his left-sided hearing loss was evidently associated with his
history of fistula.  Accordingly, the undersigned concludes that
good cause exists for plaintiff's failure to acquire and present
the evidence from Dr. Schwaber during agency proceedings.

_____

[6]Fistula is "an abnormal passage that leads from an abscess or hollow
organ or part to the body surface or from one hollow organ or part to another
and that may be surgically created to permit passage of fluids or secretions."
<u>http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=fistula</u>

As to the materiality requirement, there is at least a
reasonable probability that the ALJ would have reached a
different decision if she had been presented with the new
evidence. Plaintiff was apparently found to suffer no more than
a moderate level of pain (Tr. 301-02 [reflecting VE's testimony
that pain at the "moderately severe" level would preclude work]),
though his treating physician opined that he suffered moderately
severe pain (Tr. 121). The ALJ appeared to be predominantly
concerned with the pain and other radicular symptoms of
plaintiff's neck impairment (Tr. 21 [identifying plaintiff's
diagnosed impairments as "neck pain; degenerative disc disease of
the cervical spine; left C5-6 radiculopathy; and myofascial pain
from the neck and left shoulder"]). However, plaintiff appears
to have had just as much if not more trouble with severe headache
pain (Tr. 75, 227, 242, 247, 249, 283, 286), which evidently was
a major stumbling block in his work attempts (Tr. 75, 227), and
which could well have been caused or exacerbated by the symptoms
of Ménière's disease. Indeed, plaintiff stated that his
headaches are immediately preceded by what he describes as "eye
twitching," a complaint that has now been diagnosed as
spontaneous nystagmus (Docket Entry No. 14, Exh. A at 7), an
uncontrollable eye movement which can result from Ménière's

disease.[7] It appearing that the Ménière's symptoms of dizziness, blurred or double vision, and nystagmus were somewhat lightly regarded on the record before the ALJ as dubious consequences of plaintiff's neck injury (Tr. 250, 285-86), plaintiff's submission of evidence which confirms the cause of those symptoms is reasonably likely to change the analysis of his subjective complaints. If the credibility of plaintiff's pain complaints were to be deemed significantly bolstered by this evidence, or if the symptoms apart from pain were to have significant vocational consequences, the ultimate outcome of this case could well change. The materiality requirement is thus satisfied.

In sum, the undersigned finds that plaintiff has submitted new and material evidence of his Ménière's disease, with good cause existing to justify his failure to adduce such evidence previously. Accordingly, the case should be remanded pursuant to the sixth sentence of § 405(g), for further administrative consideration of this evidence related to plaintiff's Ménière's disease, and such other evidence as the ALJ may allow.

---

[7]See http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm ("Because control of eye movements in affected by input from the labyrinth (the part of the inner ear that senses movement and position), inner ear disorders such as Meniere's disease can also lead to acquired nystagmus.").

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**, and that the case be **REMANDED** for administrative consideration of new and material evidence pertaining to plaintiff's Ménière's disease, pursuant to the sixth sentence of § 405(g).

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 28th day of August, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

23